239 So.2d 1 (1970)
In re Advisory OPINION TO THE GOVERNOR.
No. 39823.
Supreme Court of Florida.
July 1, 1970.
*2 PER CURIAM:
 Honorable Claude R. Kirk,
 Governor of Florida
 The Capitol
 Tallahassee, Florida.
Dear Governor: 
We have the honor to acknowledge your communication of June 15th, 1970, requesting our advice pursuant to Section 1(c), Article IV, Constitution of Florida, relating to certain executive powers and duties.
Omitting the formal parts, your letter reads as follows: 
"According to the provisions of Section 1(c), Article IV, Constitution of Florida, the Governor is authorized to request the opinion of the Justices of the Supreme Court, as to the interpretation *3 of any portion of the Constitution upon any question affecting the Governor's executive powers and duties.
"Under Section 1(a), Article IV, the Governor is mandated to take care that the laws be faithfully executed. Under Section 4(e), it is the duty of a Governor to countersign all warrants disbursing state funds. In specific regard to taxation, appropriations and state expenses, Section 1(d), Article VII, Constitution of Florida, provides, `Provisions shall be made by law for raising sufficient revenue to defray the expenses of the State for each fiscal period.'
"Under the provisions of Section 31 of Chapter 69-106, Laws of Florida, referred to as the Governmental Reorganization Act, and now found in Section 216.211(1).
"`It shall be the duty of Governor, as Chief Budget Officer, to insure that revenues collected will be sufficient to meet the appropriations and that no deficit shall occur in any State Fund. If in the opinion of the Governor, a deficit will occur, he shall so certify to the Commission, and the Commission may, by affirmative action, reduce all State agency operating budgets and releases a sufficient amount to prevent a deficit in any fund.'
"Therefore, in order to properly and effectively discharge my constitutional and statutory duties and responsibilities, it will be necessary to call upon this Honorable Court for the proper construction to be placed upon House Bill 5210. Moreover, it is in furtherance of these executive powers and duties that I feel compelled to request the opinion of this Honorable Court as to whether I can properly discharge these executive powers and duties in accordance with the constitutional mandate. The facts giving rise to my inquiry and the doubt which I have regarding the exercise of these powers and duties are hereinafter set forth.
During the Regular Session commencing April 7, 1970, the Legislature enacted House Bill 5210 and entitled:
"`An Act making appropriations; providing moneys for the annual period beginning July 1, 1970, and ending June 30, 1971, to pay salaries, other expenses, capital outlay  buildings and improvements, and for other specified purposes of the various agencies of state government; providing an effective date.'
"On Friday, June 5, the Legislature adjourned sine die, and on Monday, June 8, House Bill 5210 was presented to the Governor for action. On Tuesday, June 9, 1970, I vetoed House Bill 5210, together with House Bill 4358, the latter bill relating to a formula for the distribution of minimum foundation program funds. A copy of my veto messages are attached for this Court's review. As the Court will observe, I expressed a great concern about the constitutionality of the General Appropriation Act, insofar as it contained provisions on subjects other than appropriations for salaries for public officers and other current expenses of the State. Section 12, Article III. Constitution of Florida, provides as follows:
"`Laws making appropriations for salaries of public officers and other current expenses of the state shall contain provisions on no other subject.'
"In addition, Section 6, Article III, supra, provides, in part, as follows:
"`Every law shall embrace but one subject and matter properly connected therewith, and the subject shall be briefly expressed in the title. No law shall be revised or amended by reference to its title only. Laws to revise or amend shall set out in full the revised or amended act, section, subsection *4 or paragraph of a subsection * * *'
"It is my understanding that the history behind Section 12 and 6 have been discussed in many court decisions in this and other states. I am advised that the purpose behind the people adopting Section 6 was to require that the titles of acts be sufficiently informative so as to obviate surprise or fraud that would spring from hidden provisions not indicated in the title. (See note 24 in Section 6, Article III, supra, Volume 25A, Florida Statutes Annotated) The purpose behind the people adopting Section 12, supra, formerly appearing as Section 30, Article III, Constitution of 1885, is set forth in this Court's decision in Lee v. Dowda, 19 So.2d 570, at page 571 as follows:
"`It is manifest that the Constitution considered this matter of appropriation Laws so important that it required they should be freed from all log rolling, by putting into such bills riders dealing with any other subject whatsoever, so that the attention of the Legislature should be concentrated upon the wisdom of and the necessity for the several items of appropriations made by and enumerated in the bill, and so also that the public could rest assured that when an appropriation bill was up for consideration in the Legislature nothing would be considered but the appropriations, and that this important matter should not be prejudiced by the injection into the appropriation bill of any other matters, regardless of their inherent merits or demerits.'
(See also Amos v. Moseley, 74 Fla. 555, 777, 619, (1918); State v. Lee, 121 Fla. 316, 163 So. 859, (1935); Green v. Rawls, 122 So.2d 10 (1960))
"When reviewing House Bill 5210, in light of Section 6 and 12, supra, and in light of the decisions, of this Court, it would appear to me that House Bill 5210 is unconstitutional, such unconstitutionality arising from the fact that the title does not sufficiently express and embrace the matters contained in the body of the bill; the bill embracing more than one subject not properly connected therewith; and the bill, being an appropriations bill, containing provisions on subjects other than salaries and current expenses of the State.
"A listing of these provisions is attached to this request. Specific examples are hereinafter discussed. On pages 17 and 17a, item 188 appears, and is set forth in part as follows:

 "Grants and Aids
 From General Revenue Fund
 Minimum Foundation
 Program K-12 $575,096,786
 County School Sales Tax 33,476,120
 County Capital Outlay
 and Debt Service
 Recalculation 651,696
 Educational Research &
 Development Program 1,200,000
 State Textbook Program
 Purchase of Textbooks 8,211,281
 Exceptional Child Summer
 Institutes 40,000
 Driver Education (a) 4,200,000
 Educational Leadership
 Training Act 50,000
 General Scholarships 930,000
 Nursing Scholarships 176,000
 Seminole Indian Scholarships 4,800
 Children of Deceased
 Veterans 11,000
 Exceptional Child Scholarships 213,750
 Board of Regents Scholarships 1,520,000
 Extended School Year Pilot
 Programs 400,299
 Gifted Education Program 260,000

* * * * * *
"(a) Provided, however, $2,100,000 of this appropriation is contingent upon Senate Bill 1554 or similar legislation becoming law.

 From Trust Funds
 County Capital Outlay and
 Debt Service Trust Fund 25,747,714
 Interest State School Trust
 Fund  MFP K-12 1,000,000
 Educational Aid Trust
 Fund  Aid to Counties 40,083,055

*5
 National School Lunch
 Trust Fund 12,138,218
 Student Financial Aid
 Trust Fund  Loans 900,000
 Grants and Donations
 Trust Fund 5,000
 Ex-Confederate Soldiers
 and Sailors Endowment
 Trust Fund  Scholarships 4,000
 Teachers of Mentally Retarded
  Scholarships 94,000

* * * * * *
"None of the appropriations in item 188 shall become effective unless CS for HB 4358 or substantially equivalent legislation becomes law.
"This Court's attention is directed to the underlined phrase, `None of the appropriations in item 188 shall become effective unless CS for HB 4358 or substantially equivalent legislation becomes law.' In order for the Governor to be able to veto this language, he must also veto the entire item 188, inasmuch as under Section 8, Article III, the Governor may not veto `any qualification or restriction without also vetoing the appropriation to which it relates'. The appropriation to which the quoted language hereinabove relates is the entire item 188. Therefore, the Governor would have to veto all of item 188 in order to remove this objectionable language; unless, however, the foregoing quoted language is not a `qualification or restriction,' but is in fact and law, a provision on another subject as prohibited by Section 12, supra, in which case such language would not be subject to veto, but would fall based upon the fact that it violates Section 12, as discussed in the aforementioned decisions by this Court; and also based upon the fact that the subject matter embraced within House Bill 4358 is nowhere mentioned in the title to House Bill 5210, nor is it in any way connected with the appropriations bill except by indirect reference in item 188.
"It might also be observed that the purported `qualifications and restrictions' upon item 188 is not merely limited to the foregoing quoted language, but must also include the provisions of House Bill 4358. If this language and House Bill 4358 were in fact and law a valid `qualification or restriction' upon item 188, then it should have been included in the General Appropriations bill; the fact that House Bill 4358 was enacted as a separate piece of legislation clearly reflects that the Legislature considered the provisions thereof to be concerned with subjects other than appropriations for salaries and expenses. The inclusion of a reference to House Bill 4358 in item 188 and the enactment of House Bill 4358 as a separate piece of legislation appears to be an attempt to circumvent the spirit and intent of Section 12, Article III, supra, and would encourage the doing of an act by indirection which would otherwise be prohibited directly. The foregoing quoted language in item 188 appears to be a classic example of the `logrolling' evil which Section 12 and Section 8, supra, were designed to prevent. The Chief Executive is required to accept House Bill 4358, the provisions of which are completely unknown to him, since they are not even included in the appropriations act, and if he does not accept House Bill 4358, none of the moneys appropriated by item 188 for education can be used. The foregoing quoted language, strangely enough, constitutes a condition precedent and a condition subsequent. Before item 188 can become effective, House Bill 4358 must become law  this is the happening of the event upon which the use of item 188 is conditioned; yet, there has been a specific appropriation made by item 188 and the so-called estate or rights have been vested, but are defeated upon the occurring of a future event, namely, the veto by the Governor of House Bill 4358.
"Compounding the situation is the fact that the Governor must act on House Bill 5210 or any appropriations bill which might contain a similar condition, within a certain time period after he receives it; conceivably, that time period, whether it be 7 or 15 days, can expire before the Governor has constitutionally been presented *6 with the bill upon which the appropriation is conditioned. There are enumerable unforseen situations that could develop as a result of permitting such conditional language to appear in appropriations bills; and I have merely set forth those that come to mind at the moment. I might also observe that House Bill 4358, a copy of which is attached, is an amendment of the minimum foundation program formula. However, if this Court will examine item 188, it will find that this item deals with appropriations totally unrelated to the minimul foundation program, such as Seminole Indian Scholarships, Nursing Scholarships, Children of Deceased Veterans, Exceptional Child Scholarships, Driver Education, etc. Yet, the Legislature has attached the conditional language as outlined above to the entire item 188, and has required that the Governor either accept House Bill 4358 or the entire item 188 is not effective; regardless of the fact that there are specific appropriations contained within item 188 that are totally unrelated to House Bill 4358.
"Another example of the invalidity of House Bill 5210 is the fact that it contains provisions which purport to amend, supercede or repeal other provisions in the general law which amendment or repeal is neither mentioned in the title nor is related to appropriation for salaries and current expenses of the State. For example, the language appearing immediately following items 130 and 131 of the Appropriation Act apparently amends the powers and duties of the Division of Commercial Development, as set forth in Section 288.03, et. seq., Florida Statutes, although no reference is made in items 130 and 131 to Section 288.03; the aforementioned language appears to be provisions on subjects other than appropriations and conflicts with Sections 6 and 12 of Article III, supra.
"An example of the danger of including purported amendments to the general law is reflected by the language immediately preceding item 172 on page 15 of the General Appropriations Act relating to the Department of Education. The phrase, `in lieu of Section 236.071(1), 236.074, 236.075 and 231.53 F.S.' is apparently intended to permit the expenditure of the funds appropriated to the Department of Education in the manner provided in the appropriation act, notwithstanding the aforementioned sections. Not only does this appear to conflict with Sections 6 and 12 of Article III, supra, it purports to make reference to a section that was repealed during the last special session of the Legislature in 1969 (see Chapter 69-1735, Laws of Florida, repealing Section 236.071, F.S., supra). Although reference to a repealed section may, in this instance, be harmless, it does illustrate the inherent dangers of attempting to amend or repeal or modify provisions of the general law in an appropriation bill and in a manner not consistent with the Constitution.
"Another example of the type of provisions which are of doubtful validity, and which render the appropriation act itself doubtful is found in the language appearing immediately after item 195 on pages 18 and 18(a) of the appropriations act. This language purports to amend the duties and responsibilities of the Division of Vocational Rehabilitation, formerly set forth in Chapter 229, Florida Statutes. Again, this language appears to be in direct conflict with Sections 6 and 12 of Article III, supra, in that it is not reflected in the title and relates to subject matter other than salaries and expenses of the State; moreover, these provisions do not appear to constitute `qualifications or restrictions' within the meaning of Section 8, Article III, supra.
"The following language in Section 8 on page 73 of House Bill 5210 purports to amend the duties and responsibilities *7 of the State Board of Administration as follows:
"`It is the intent of the Legislature that if these revenue certificates cannot be sold on the open market within the maximum legal rate authorized by law then the State Board of Administration shall purchase $12,600,000.00 of these certificates at the maximum interest rate permitted by law as investments for any funds under its control which are authorized to invest in securities of this type.'
"Not only is this language in apparent conflict with Section 6 and 12 of Article III, supra, but additionally, this language appears to conflict with Section 122.47, Florida Statutes, and Section 215.44-53, Florida Statutes, as well as Section 9, Article 12, Florida Constitution, in that it constitutes an effort on the part of the Legislature to control the exercise of discretion by the State Board of Administration, notwithstanding the aforementioned provisions to the apparent contrary.
"One further set of examples is called to the Court's attention. In the latter part of the appropriation act, there are provisions to the effect that, `no monies appropriated in this act,' or, `no monies appropriated in item 1-871' may be expended or used for certain purposes. I do not disagree with the intent of some of these provisions. In fact, I heartily support the purposes they are designed to serve. Yet, they are provisions on subjects other than appropriations for salaries or current expenses of the State, within the meaning of Section 12, supra, and appear also to perpetuate `log-rolling.' If these provisions were determined to be `qualifications or restrictions' within the meaning of Section 8, Article III, supra, I would be forced to veto an entire appropriations act in order to remove these `qualifications or restrictions' if I found them to be objectionable. This places any Governor in the untenable position of forcing him to accept provisions which might be objectionable, or veto the entire appropriation act. This would seem to defeat the intent of the anti-logrolling provisions contained in the Constitution. Moreover, I do not believe that these provisions should be classified as `qualifications or restrictions,' but rather should be treated as provisions on subjects other than appropriations and more properly confined to separate pieces of legislation subject to veto by the Governor if he chooses to exercise such veto.
"The provisions of Section 6, 8 and 12 of Article III, supra, must be construed in such a manner as to permit the veto power of any Governor to be meaningful; the veto is always subject to the check and balance of the overriding action of the House and Senate. The significant point is that a Governor must be presented with an appropriations bill which gives him the opportunity to exercise the power of veto and does not perpetuate the evil of logrolling. The present bill contains many doubtful provisions which raise serious questions as to the validity not only of the provisions but of the very act itself, the determination of which is necessary and vital to the discharge of my executive powers and duties under the Constitution. I feel that it is my duty as Governor of the State of Florida, and Chief Budget Officer, to request an advisory opinion from this Court regarding these provisions and regarding this act, which opinion I respectfully submit would also serve to avoid a multiplicity of suits which might otherwise cripple the orderly financing and administration of State government. In support of this Court's jurisdiction to entertain my request, I respectfully call this Court's attention to its decision in: In The Matter of Executive Communication of February 19, 1872, 14 Fla. 283; In The Matter of Executive Communication of February 29, 1872, 14 Fla. 285; and In Re Advisory Opinion to The Governor, 63 So.2d 321 (1953).

*8 "In view of the foregoing, I therefore have the honor to request your written opinion on substantially the following questions:
"`1. In light of the provisions of Sections 6, 8 and 12 of Article III, Constitution of Florida, does House Bill 5210, the General Appropriations Act, enacted during the 1970 Regular Session of the Legislature constitute a valid appropriation authorizing the countersigning of warrants by the Governor and the faithful execution thereof?'
"`2. In light of the provisions of Sections 6, 8 and 12 of Article III, Constitution of Florida, do the items or appropriations contained in House Bill 5210, as hereinabove and hereinafter referred to, constitute valid appropriation authorizing the countersigning of warrants by the Governor and the faithful execution thereof?'
"`3. If the answer to Question 2 is in the affirmative, are the sections, clauses and phrases appearing in connection with those items described in Question 2 properly included within a General Appropriations Bill in light of Sections 6, 8 and 12 of Article III?'
"This Court's attention is invited to a recent decision rendered by the Circuit Court of the Twelfth Judicial Circuit of Florida in Smith v. Kirk, et al., Case No. 11,195, July 15, 1969, construing language contained in the General Appriations Act (in light of Section 12, Article III, supra) and declaring such language similar to the examples hereinabove and hereinafter described, to be unconstitutional. (copy attached) It is my understanding that this decision was not appealed.
"It should be clearly emphasized that many of the provisions which are contained in the General Appropriations Act and to which I have directed this Court's attention deal with matters which I approve of but which should be embodied in our general law by way of separate specific enactments; but, it is, nevertheless, my duty to call this Court's attention not only to provisions which I find to be objectionable but to provisions which I would generally approve and which have also been improperly included within a General Appropriations Bill. What must be resolved are not merely permissable limits of subjects within the General Appropriation Act but, more significant, the preservation of the duties and responsibilities of the independent branches of government.
"In view of the fact that House Bill 5210 will become effective on July 1, it is respectfully requested that the court waive the ten-day rule and render its opinion as soon as possible. Your assistance in resolving these vital questions is greatly appreciated."
The import of your request is to have this Court pass upon the constitutionality vel non of the 1970 General Appropriations Bill referred to in your letter as House Bill 5210, recently identified as Chapter 70-95, Laws of Florida 1970. You also referred to Committee Substitute to House Bill 4358, now known as Chapter 70-90, Laws of Florida 1970, and to Senate Bill 1554 which apparently was not enacted into law.
This Court was not always in agreement under the Constitution of 1885 as to whether or not such a question could be answered. Compare Advisory Opinion to Governor Dan McCarty, 63 So.2d 321, and Advisory Opinion to Governor Collins, 113 So.2d 703. However, it is noteworthy that in the 1968 constitutional revision, authority and direction were given this Court to permit interested persons to be heard, subject to the Rules of the Court which was followed by the implementation of our Rule F.A.R. 2.1(h) providing for such participation. Pursuant to such authority interested persons, including members of the Legislature, have presented both sides of this controversy by the filing of briefs. Because of the foregoing, *9 and in view of the great public interest in maintaining the fiscal stability of state government, we have decided to answer your request.
At the outset, our attention is directed to provisions of the Constitution that:
"No money shall be drawn from the treasury except in pursuant to appropriation made by law." Sec. 1(c), Article VII.
"Laws making appropriations for salaries of public officers and other current expenses of the state shall contain provisions on no other subject." Sec. 12, Article III.
"* * * The Governor may veto any specific appropriation in a general appropriation bill, but may not veto any qualification or restriction without also vetoing the appropriation to which it relates." Sec. 8, Article III.
In your executive communication you point out a large number of matters which you feel raise questions as to the constitutional validity of House Bill 5210 (Chapter 70-95) as a whole.
Provisions in a General Appropriations Bill on any subject other than "appropriations for salaries of public officers and other current expenses of the State" and matters reasonably related thereto are invalid and are not law. See Sec. 1(c), Article VII, supra.
The Legislature may not validly so draft a general appropriations bill as to unduly and unreasonably preclude the exercise of the executive power to "veto any specific appropriation in a general appropriation bill". In the early history of the State, it was customary for such bills to fix in minute detail each authorized expenditure. In later years appropriations to state offices and for state activities have been in larger sums and have been more flexible as to how these funds may be expended. While the Court should be slow to restrict the legislative judgment in making appropriations, they should not permit the circumventing by the Legislature of the proper powers of the Governor, including his power of veto.
Our examination of House Bill 5210, in the light of your comments, does not reveal that the Legislature has, in this instance, exceeded its constitutional powers in this regard. There are, in this bill, over nine hundred "items". Many of these items embrace numerous "specific appropriations". For example "Item 188", which will be discussed in more detail later, has twenty-five "specific appropriations". Any of these could have been reached by individual veto. See Sec. 8, Article III, supra.
Appropriations may constitutionally be made contingent upon matters or events reasonably related to the subject of the appropriation, but may not be made to depend upon entirely unrelated events. For example, an appropriation to a university might be contingent upon the registration of a minimum number of students who could benefit from the appropriation or contingent upon the state revenues reaching a certain level. There is no constitutional impediment to an appropriation being made contingent upon another bill, reasonably related to the appropriation and where there is a direct and relative interdependence between them, becoming law.
You make specifc reference to "Item 188" of House Bill 5210. Under this "item" twenty-five specific dollar-amounts are listed. As respects one of these sums, it is "Provided, however, $2,100,000 of this appropriation is contingent upon Senate Bill 1554 or similar legislation becoming law." As regards the entire "Item 188", it is provided "None of the apppropriations in Item 188 shall become effective unless Committee Substitute for House Bill 4358 or substantially equivalent legislation becomes law." We are advised and take judicial notice that Committee Substitute for House Bill 4358, now known as Chapter 70-94, Laws of Florida, has now become law, thus meeting the contingency and any question because of such contingency has therefore become moot.
*10 The proviso involving Senate Bill 1554 above quoted appears in the following context 
"(a) Provided, however, $2,100,000 of this appropriation is contingent upon Senate Bill 1554 or similar legislation becoming law." (Italics supplied.)
While it contained no appropriation, Senate Bill 1554  which did not pass  would have increased the tax on driver's licenses "for the purpose of financing the driver education program in the secondary schools". The specific appropriation which was made contingent upon the enactment of Senate Bill 1554 related to driver education in the amount of $4,200,000. This is the type of qualification authorized by Sec. 8(a) of Article III of the Constitution of Florida, and since Senate Bill 1554 did not become law the appropriation for driver education aforementioned must stand reduced from $4,200,000 to $2,100,000.
Committee Substitute for House Bill 4358 amends several sections of the law relating to the overall educational program and particularly the minimum foundation provisions. Item 188 appropriates more than half a billion dollars, much of which is needed to meet the funds to be spent pursuant to Committee Substitute for House Bill 4358. If Committee Substitute for House Bill 4358 had not become law much of the appropriation in Item 188 would not have been expendable. While it might have been wiser for the Legislature to have appropriated funds sufficient to meet the school needs without Committee Substitute for House Bill 4358 and then make a contingent appropriation of additional funds to meet the increased needs resulting from Committee Substitute for House Bill 4358, if enacted, it is clear that the relationship between Committee Substitute for House Bill 4358 and later Item 188 is so close that the proviso under scrutiny is within the legislative prerogative.
You point out that Item 172 of House Bill 5210 is "in lieu of Sections 236.071(1), 236.071, 236.075 and 231.53, F.S." We find no constitutional impediment to a General Appropriations Bill making allocations of State funds for a previously authorized purpose in amounts different from those previously allocated or substituting adequate specific appropriations for prior continuing appropriations. Whether an appropriations bill can, by appropriating a lesser amount, reduce a continuing appropriation provided in preexisting law is a question neither properly presented nor decided here.
Section 8 of House Bill 5210 is in part as follows 
"It is the intent of the Legislature that if these revenue certificates cannot be sold on the open market within the maximum legal rate authorized by law then the State Board of Administration shall purchase $12,600,000.00 of these certificates at the maximum interest rate permitted by law as investments for any funds under its control which are authorized to invest in securities of this type."
You suggest that this provision is invalid. Since the factual situation which is a condition precedent to any action under this provision may never occur, any present inquiry as to its validity is premature. To the extent that this provision in House Bill 5210 may affect the validity of the entire bill, it is our opinion that it does not. If held invalid in an adversary proceeding by a court of competent jurisdiction it is readily severable from the rest of the statute.
You call attention to several provisions of House Bill 5210 relating to the expenditure of various items of money appropriated. The Constitution expressly recognizes the power of the Legislature to make appropriations subject to qualifications and restrictions. See Sec. 8 of Article III. Such qualifications and restrictions may not go to the extent of changing other substantive law, but they may limit or qualify the use to which the moneys appropriated may be put and may specify reasonable conditions precedent to their *11 use, even though this may leave some governmental activities underfinanced in the opinion of officers of other departments of government.
It would be inappropriate for us, at this time, to undertake to analyze all the provisions of House Bill 5210 and discuss in detail all qualifications and restrictions upon appropriations found in this law. Much of your communication consists of pointing out dangers which you fear may arise from future efforts on the part of the Legislature to unduly restrict the Chief Executive in the exercise of the power of veto and in so drafting appropriation bills as to make them instruments of "logrolling" contrary to the intent of Secs. 6, 8 and 12, Article III. We have carefully considered these observations and, while they may well be of academic interest, we do not find such comments to require a judicial interpretation at this time.
We now turn to your specific question as distinguished from your general discussion of House Bill 5210: 
"1. In light of the provisions of Sections 6, 8 and 12 of Article III, Constitution of Florida, does House Bill 5210, the General Appropriations Act, enacted during the 1970 Regular Session of the Legislature constitute a valid appropriation authorizing the countersigning of warrants by the Governor and the faithful execution thereof?"
We do not find anything in your communication that would vitiate the 1970 General Appropriations Act and, while there may be some items which would have appropriately been a subject of your line item veto, we do not find any impediment created by your executive communication that would prevent your disbursing funds in accordance with the said Appropriations Bill, and except, unless and until some particular item is voided by a court of competent jurisdiction, you would be authorized to countersign warrants based thereon and presented to you in due course.
The other matters and things about which you have inquired are answered to the extent of our authority to do so in the body of this communication.
In summary, we advise you that:
(1) In our opinion, the 1970 General Appropriations Act, against a general attack, is valid and within the orbit of legislative power and against such a general attack a court of competent jurisdiction should and would hold it to be so.
(2) That the Legislature does not have the power nor the right under the Constitution of this State to make law in an appropriations bill on other subjects, unless the other subjects are so relevant to, interwoven with, and interdependent upon, the appropriations so as to jointly constitute a complete legislative expression on the subject.
 Respectfully,
 RICHARD W. ERVIN
 Chief Justice
 B.K. ROBERTS
 CAMPBELL THORNAL
 VASSAR B. CARLTON
 JAMES C. ADKINS, JR.
 JOSEPH A. BOYD
 Justices
*12
The Honorable Claude R. Kirk, Jr.
Governor of the State of Florida
The Capitol
Tallahassee, Florida
My dear Sir:
An answer to your request for an advisory opinion concerning the Appropriations Act of 1970, in its last analysis, would require me to say whether the whole act was constitutionally valid or invalid. Whatever may be my individual views on the encompassing question of constitutionality, eleven years ago a majority of this Court in In Re: Advisory Opinion to the Governor, 113 So.2d 703, declined to answer a request for an advisory opinion from the then Governor Collins for the reason that this Court was without authority to render an advisory opinion to the Governor determining the constitutional validity vel non of an act of the Legislature. At that time in a separate opinion to Governor Collins, I stated (113 So.2d 706):
"On several occasions since my appointment to this Court I have participated in advisory opinions to you and your predecessors in office which construed or passed upon the constitutionality of certain statutes of this State. It is now my view that, in rendering such opinions, I exceeded my authority as a Justice of this Court.
"The Constitution plainly authorizes the Justices of this Court to advise you `as to the interpretation of any portion of [the Florida] Constitution upon any question affecting [your] executive powers and duties.' From the adoption of the present Constitution until recent years the Justices of this Court have refused to advise the Governors of Florida as to their interpretation of or to pass upon the constitutionality of statutes of this State. It is my view that this Court should now return to that salutary principle epitomized in the conclusion of the Advisory Opinion to the Governor, 50 Fla. 169, 39 So. 187, where the then Justices said:
"`Reduced to its last analysis, the purpose of your letter is not to have us construe any clause of the Constitution affecting your executive powers and duties, but to have us pass upon the constitutionality of an act of the Legislature.
"`Section 13 of article 4 of the Constitution authorizes the justices of the Supreme Court, on the Governor's request, to interpret only some portion of the Constitution, and does not authorize the Court, upon such request, to interpret or pass upon the constitutionality of statutes that affect the Governor's executive powers and duties. Advisory Opinion to Governor, 39 Fla. 397, 22 So. 681. For the reasons stated, we must respectfully decline to give any opinion upon the questions propounded.'"
The critical language of the Constitution of 1968 under which your request is presented is identical to the language of the Constitution of 1885 under which the request of Governor Collins was made. The provisions of the 1968 Constitution relating to procedure for obtaining advisory opinions does not  in my judgment  in any way enlarge the powers of this Court with respect to this basic constitutional question.
Looking back over more than a decade I can only conclude that the passage of time has confirmed the wisdom of this Court expressed by the majority in the advisory opinion above referred to, and my own views quoted above.
Consistency compels me therefore to respectfully decline to render any opinion upon the questions propounded.
 Respectfully,
 E. HARRIS DREW
 Justice.
EHD:gr