374 So.2d 959 (1979)
In re ADVISORY OPINION TO the GOVERNOR REQUEST OF JUNE 29, 1979.
No. 57208.
Supreme Court of Florida.
July 17, 1979.
*960 Sharyn L. Smith and Mark Herron, Tallahassee, for Florida Legislature.
J. Kendrick Tucker, Patricia R. Gleason and Percy W. Mallison, Jr., Asst. Atty. Gen., Tallahassee, for Attorney General.
Talbot D'Alemberte of Steel, Hector and Davis, Miami, for Volusia County Bar Association, Inc., Putnam County Bar Association, Inc., and St. Johns County Bar Association, Inc.
Thomas A. Clark and Peter J. Winders, for Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa.
The Honorable Bob Graham
Governor, State of Florida
The Capitol
Tallahassee, Florida 32304
Dear Governor Graham:
We have the honor of acknowledging your communication of June 29, 1979, requesting our advice, pursuant to article IV, section 1(c) of the Florida Constitution and rule 9.500 of the Florida Rules of Appellate Procedure, as to the interpretation of a portion of the constitution affecting your executive power of appointment.
Omitting the formal parts, your letter reads as follows:
By virtue of the provisions of Article IV, Section 1(c), Florida Constitution, I respectfully request your written opinion as to the interpretation of a portion of the Florida Constitution affecting my executive powers and duties.
Pursuant to Florida Appellate Rule 9.500(b)(1), the first question for the Court is whether this request is within the purview of Article IV, Section 1(c), Florida Constitution. Under Article V, Section 11, Florida Constitution, it is my *961 duty to fill by appointment vacancies in judicial office. Article X, Section 3, Florida Constitution, defines a vacancy in office and provides that a vacancy "shall occur upon the creation of an office...." The question presented here is whether there has been a constitutional creation of judicial vacancies. This Court has previously determined that such a question is within the purview of Article IV, Section 1(c), Florida Constitution, by responding to a similar request from my predecessor in office. In re Advisory Opinion to the Governor, 281 So.2d 328 (Fla. 1973).

Creation of Vacancies
The facts can be stated in chronological order. All dates are in the year 1979.
April 2. Pursuant to Article V, Section 9, Florida Constitution, the Supreme Court certified a need for increasing the number of judges and for increasing and redefining appellate districts to a regular session of the Legislature. In re Certificate of Judicial Manpower for Circuit and County Courts, As Required by Section 9, Article V, Florida Constitution, 370 So.2d 363 (Fla. 1979); In re Certification Under Article V, Section 9, Florida Constitution, To Redefine Appellate Districts And To Increase the Number of Judges On the District Courts of Appeal, 370 So.2d 365 (Fla. 1979).
June 6. After considering the Court's certificate, the Legislature, by two-thirds of the membership of both houses, enacted CS for SB 268. The bill altered the court's certification by increasing the number of judges recommended for the First District from 7 to 9 and decreasing the number of judges recommended for the Third District from 9 to 8. While the statute created a Fifth District, it altered the court's recommended alignment by taking the Tenth Judicial Circuit from the new Fifth District, and placing it into the realigned Second District. The bill left undisturbed the court's recommendation for: a) additional judges for the Second, Fourth, and Fifth Districts, b) realignment of the First and Fourth Districts, c) no change for the alignment of the Third District, and d) additional judges for various circuit and county courts. The Legislature then adjourned sine die.
June 20. After CS for SB 268 was enrolled and signed by the required constitutional officers, it was presented to this office.
Article V, Section 9, Florida Constitution, provides the procedure for the determination of the number of judges and for increasing and redefining appellate districts. Section 9 sets forth two different procedures for accomplishing this purpose. The first assumes that the Supreme Court presents a timely certificate of need to the Legislature:
If the supreme court finds that a need exists for increasing or decreasing the number of judges or increasing, decreasing or redefining appellate districts and judicial circuits, it shall, prior to the next regular session of the legislature, certify to the legislature its findings and recommendations concerning such need. Upon receipt of such certificate, the legislature, at the next regular session, shall consider the findings and recommendations and may reject the recommendations or by law implement the recommendations in whole or in part; provided the legislature may create more judicial offices than are recommended by the supreme court or may decrease the number of judicial offices by a greater number than recommended by the court only upon a finding of two-thirds of the membership of both houses of the legislature, that such a need exists. A decrease in the number of judges shall be effective only after the expiration of a term.
The second procedure is in the event the Supreme Court fails to make such certification to the Legislature:
If the supreme court fails to make findings as provided above when need exists, the legislature may by concurrent resolution request the court to certify its findings and recommendations and upon the failure of the court to certify its findings for nine consecutive months, the legislature may, upon a finding of two-thirds of *962 the membership of both houses of the legislature that a need exists, increase or decrease the number of judges or increase, decrease or redefine appellate districts and judicial circuits.
Since the Court submitted a timely certificate, I am concerned with the first procedure.
The only specific authorization for the Legislature to alter the Court's recommendations for increasing, decreasing or redefining appellate districts appears in the second procedure. On the other hand, the first procedure authorizes the Legislature to reject the Court's recommendations or by law implement the recommendations in whole or in part.
The construction to be given Article V, Section 9, Florida Constitution, is in question.

Judicial Nominating Commissions
Article V, Section 20, Florida Constitution, requires the Governor and The Florida Bar to appoint members of judicial nominating commissions on July 1 from "within the territorial jurisdiction of the affected court." The status of these commissions is in question.

Effective Date
The bill contains a number of provisions which are not subject to question and are essential to the judiciary and citizens of Florida. I will allow the bill to become law without my signature.
Pursuant to Article III, Section 8, Florida Constitution, the bill will not become law until July 5. The bill provides an effective date of July 1. The effective date of the law is in question.

Questions
In view of the legislative implementation of Article V, Section 9, Florida Constitution, and considering the other provisions of the Florida Constitution as cited, I am in doubt as to whether these judicial offices have been created so that vacancies exist. Therefore, I request your written opinion on the following questions:
1. Has there been a constitutional creation of judicial vacancies by virtue of CS for SB 268 so as to permit gubernatorial appointments to judicial office and judicial nominating commissions?
2. If so, what is the effective date of the new law?
3. If not, is the law defective in whole or in part?
Article IV, Section 1(c), Florida Constitution, permits a written opinion in less than ten days if the delay would cause public injury.
Judicial nominating commissions to conform with district court alignment should be in existence by July 1. The judiciary needs new judges as soon as the appointments can be properly made. To allow these questions to be raised by others after realignment of districts and appointment of judges, could be chaotic.
In accordance with our rules, we made a preliminary determination that your request is properly within the purview of article IV, section 1(c), in that the legislation in question directly affects your duty as governor to fill vacancies in judicial office[1] and to appoint members of the judicial nominating commissions.[2] Your request notes certain confusion surrounding this important enactment, which creates new judicial positions at three levels of Florida's judiciary and redefines the state's appellate districts. In light of the irreparable harm to the public that might result from an erroneous implementation of this statute, we have determined that we will exercise our discretion to answer your inquiries. To assure full and fair consideration of the issues raised, we permitted interested persons to file briefs and to present oral argument before the court.[3]
*963 It is essential to our response to your inquiry that we recount briefly the sequence of events in 1979 which led to the enactment of CS for SB 268. On March 22 we certified to the legislature, pursuant to article V, section 9 of the Florida Constitution, our finding that a need exists for ten additional circuit court judgeships and seven additional county court judgeships. In re Certificate of Judicial Manpower for Circuit and County Courts, 370 So.2d 363 (Fla. 1979). On April 2 we certified to the legislature, under the same constitutional provision, our finding that a need exists for ten additional district court of appeal judgeships and for a redefinition of the state's appellate districts. In re Certification Under Article V, Section 9, Florida Constitution, to Redefine Appellate Districts and to Increase the Number of Judges on the District Courts of Appeal, 370 So.2d 365 (Fla. 1979). In this latter certification, the court recommended one additional judgeship for the second district, two additional judgeships for the third district, and one additional judgeship for the fourth district. No additional judgeships were recommended for the first district court. We also recommended the creation of a fifth appellate district that would encompass the fifth, seventh, ninth, tenth, and eighteenth judicial circuits, together with a concomitant realignment of the three existing appellate districts affected by the assignment of these judicial circuits to the newly recommended fifth appellate district. Additionally, we recommended that six judgeships be created for the new fifth district.[4]
During its 1979 regular session, the legislature considered the findings and recommendations of the court, and on June 6, the final day of the extended regular session, enacted CS for SB 268 by a two-thirds vote of the membership of both houses.[5] This bill created the seventeen trial court judgeships recommended by the court in its first certification. It also created eleven new judgeships for the district courts of appeal and established a fifth appellate district, but not in the manner recommended by the court in its second certification. The judgeships recommended by the court and approved by the legislature were as follows:

 Recommended Implemented
First District 0 2
Second District 1 1
Third District 2 1
Fourth District 1 1
Fifth District 6 6
 __ __
TOTAL 10 11

The fifth appellate district created by the legislature included the fifth, seventh, ninth, and eighteenth judicial circuits, as recommended by the court, but omitted the tenth judicial circuit which had also been recommended.
The act specified an effective date of July 1, 1979. After being enrolled and signed by the required constitutional officers, CS for SB 268 was presented to you on June 20. In your letter of June 29 requesting our advice on these questions, you stated that you would not sign this legislation but that you would allow it to become law without your signature. Accordingly, under article III, section 8(a) of the Florida Constitution, this bill would become law on July 6. We now note that you neither vetoed nor signed CS for SB 268.
Turning now to your request, we consider individually the questions you have posed.

Part I  Validity of the Legislation
Article V, section 9 of the Florida Constitution provides in relevant part:
If the supreme court finds that a need exists for increasing or decreasing the number of judges or increasing, decreasing or redefining appellate districts and judicial circuits, it shall, prior to the next *964 regular session of the legislature, certify to the legislature its findings and recommendations concerning such need. Upon receipt of such certificate, the legislature, at the next regular session, shall consider the findings and recommendations and may reject the recommendations or by law implement the recommendations in whole or in part; provided the legislature may create more judicial offices than are recommended by the supreme court or may decrease the number of judicial offices by a greater number than recommended by the court only upon a finding of two-thirds of the membership of both houses of the legislature, that such a need exists.[6]
This provision has not previously been the subject of any judicial interpretation. To guide our interpretation, we look to three established rules of constitutional construction.
In construing provisions of the constitution, each provision must be given effect, according to its plain and ordinary meaning. The court must give provisions a reasonable meaning, tending to fulfill, not frustrate, the intent of the framers and adopters. Constructions which are strained, lead to absurd results, or render another provision nugatory must be avoided. Gray v. Bryant, 125 So.2d 846 (Fla. 1960). Unless a different intent is clearly manifested, each section of the constitution should be read in conjunction, with all other provisions to determine its proper meaning, and the entire document should receive a consistent and uniform interpretation. Askew v. Game and Fresh Water Fish Commission, 336 So.2d 556 (Fla. 1976). Where particular words or phrases are ambiguous, resort may be had to the history of the particular provision. Williams v. Smith, 360 So.2d 417 (Fla. 1978).
(1) Applying the first set of principles, we can see that the framers of article V, section 9, did not intend the creation of new judicial positions, of new appellate districts or judicial circuits, or the realignment of existing appellate districts and judicial circuits to be solely the prerogative of either the legislature or the judiciary. The two branches of state government are, instead, required to share that responsibility, with each performing specifically delineated functions. The supreme court determines that a need exists and makes recommendations to the legislature to meet those needs. That body may then reject the court's recommendations, or it may implement them "in whole or in part."
The plain language of this section suggests that the phrase "in whole or in part" would allow the legislature to implement in part each recommendation which the constitution authorizes the court to certify. The supreme court's recommendations would, in effect, serve as the outer limits of what the legislature may do (except when, by a two-thirds vote, the legislature increases the number of judgeships beyond the increase recommended by the court or decreases the number of judgeships beyond the decrease recommended by the court).
Those rules of construction which require adherence to the plain meaning of language in the constitution suggest, then, that the legislature is free to implement each of the court's recommendations in whole or in part.
(2) Applying the second principle of construction  that all provisions of the constitution should be read in conjunction with all others so as to provide a consistent meaning  directs our attention to other constitutional provisions which require joint legislative-judicial responsibility. Under article V, section 2(a), the supreme court has the initial responsibility to adopt rules of procedure and practice for the courts, and the legislature is given the power to reject any rule upon a two-thirds vote. No provision is made for partial acceptance by the legislature  either it must completely reject a rule or allow it to remain effective. This limitation is in striking contrast to the specific *965 authorization for legislative implementation "in whole or in part" under article V, section 9. Similarly, under article III, section 16, relating to legislative reapportionment, the legislature is required to adopt an initial apportionment resolution which must be approved by the supreme court. The court's authority, however, is restricted to determining the resolution's validity or invalidity  it cannot amend the resolution to apportion in whole or in part. (Of course, upon a failure of the legislature to reapportion, the court is authorized to enter its own apportionment order, just as under article V, section 9, the legislature can create judgeships or realign appellate districts and judicial circuits upon a failure of the court to certify the need for these actions.) These provisions suggest that the phrase "in whole or in part" in article V, section 9, was intended to create a legislative power greater than a mere acceptance or rejection of the court's proposals.
(3) The third constructional tenet that is relevant here  resort to the history of a constitutional provision that is ambiguous  leads to an analysis of the development of this provision during the 1971 special session of the legislature.
Article V, section 9, became part of the Florida Constitution in 1972, as part of a general revision of article V adopted by the legislature in 1971. No previous constitution contained a similar provision. The process by which this section was drafted reflects the intent of its framers.[7]
The first drafts, prepared by House Judiciary Committee in September and early November 1971, provided that increases or decreases in judicial positions, appellate districts, and judicial circuits, and realignment of districts and circuits, were to be accomplished "only by certificate of the supreme court." The certificate was to "take effect thirty days after adjournment of the next succeeding regular session of the legislature ... unless disapproved or modified by law at that session." (Emphasis supplied.) As passed by the House, however, the proposed provision contained no reference to the supreme court's certification, and the entire responsibility for implementing changes in the number of judges, and in the alignment and number of districts and circuits, was assigned to the legislature.[8]
The Senate substantially amended the House resolution, reinstating the supreme court's certification authority but retaining the legislature's authority to modify at will the court's recommendations. In fact, the court was expressly authorized to certify only its findings of fact; it was not authorized to certify recommendations.[9]
A conference committee, formed to resolve differences between the House and the Senate, in due course produced section 9 in its present form. The House Committee summarized the proposed provision as follows:
a. Supreme Court certifies need to increase or decrease number of judges.
b. Legislature shall act to approve or to reject;
c. If legislature wants to create more judicial officers than recommended by the court (or to reduce beyond such recommendation), it must find a need for such action by two-thirds vote;
d. If the Supreme Court fails to make finding [that] need exists, legislature *966 may request court to make findings starting process described above.
e. If court fails to certify within nine months, the legislature may, on a finding of two-thirds, increase or decrease judges.
As is readily apparent, the framers of section 9 were concerned with the integrity of the court's certification, allowing a deviation only to exceed the court's recommendation for an increase or decrease of judgeships, and then only by a two-thirds majority.
Conclusion. It is apparent from the foregoing analysis that article V, section 9 permits the legislature to implement each recommendation of the court in whole or in part. This conclusion is consistent with the legislature's fiscal role of ensuring adequate annual revenues to support all expenditures.[10]
Translating this conclusion to the questions you have posed, there is no doubt that the creation of circuit and county court judgeships in CS for SB 268  in exactly the manner certified by the court  is valid under article V, section 9. Similarly, the creation of a fifth appellate district by CS for SB 268  implementing "in part" the court's recommendation  is also valid under that provision. The omission of one recommended judicial circuit from the new appellate district is not a prohibited modification of the court's recommendation; however, the addition of one or more judicial circuits not included in the court's certification would be a prohibited modification.
The creation of district court judgeships stands on a somewhat different legal footing than these, but it is also constitutionally valid. To maintain the role of the court in the creation of new judgeships as was envisioned by the framers of this provision, it is necessary to consider each recommendation for judgeships in an appellate district as an independent recommendation of the court. A "recommendation," as that term is used in article V, section 9, necessarily refers to the certification of a judicial manpower need for a judicial circuit or an appellate district or the certification of a need to realign an appellate district or a judicial circuit. This definition is best understood by considering its practical effect in a common situation. If the court were to certify the need for two additional circuit court judgeships for a particular judicial circuit, with or without recommendations for other judicial circuits, the legislature could, by simple majority vote in each chamber, authorize one, two, or no judgeships for that circuit. (This would reject or implement in whole or in part the court's recommendation.) The legislature could also, by a two-thirds vote of the membership of each chamber, authorize three or more judgeships for that circuit. (This would exceed the court's recommended increase by the authorized two-thirds majority.) The legislature could not, however, increase to three the number of new judgeships if less than a two-thirds vote were obtained in either house, and it could not by any vote use the court's certification of the need for additional judicial manpower in one judicial circuit as a basis to create one or more judgeships in another judicial circuit.
The legislature approved the number of judges certified for the second, fourth and fifth district courts of appeal, thus validly implementing the court's recommendations for these districts "in whole." It decreased by one the number certified for the third district, thus validly implementing our recommendation for this district "in part." The legislature exceeded the court's recommendations only for the first district by creating two judgeships which were not recommended. Article V, section 9 provides, however, that the legislature may increase the recommended number of judgeships upon a two-thirds vote of each house. CS for SB 268 was duly enacted by this requisite two-thirds majority, so that these judgeships are also validly created. Additionally, in chapter 79-312, section 3, the legislature amended section 35.06(1), *967 Florida Statutes (1977), by providing that there shall be nine judges rather than seven in the first district. Chapter 79-312 was adopted by a vote of 29 to 4 in the Senate[11] and by a vote of 107 to 0 in the House of Representatives.[12] The legislature's finding that a need exists for these two additional judgeships is clearly evidenced by its incorporation of the creation of these additional judgeships in chapter 79-312 which transfers all appellate jurisdiction from the Industrial Relations Commission to the first district. This transfer of jurisdiction, not known to the Supreme Court at the time of certification, created a need for these additional judges in the first district.
In answer to your inquiry, we would advise you that CS for SB 268 has validly created the legislatively approved judicial offices in the county, circuit, and district courts, and that a fifth appellate district was thereby validly created to encompass the fifth, seventh, ninth, and eighteenth judicial circuits. The appointments which are available to you under CS for SB 268 include the five new judgeships created for the first, second, third, and fourth district courts, as many of the six new judgeships for the fifth district court as are not filled by judges opting under the legislation to become a part of the fifth district court, and as many of the old judgeships in the first, second, and fourth district courts as are vacated by judges opting into the fifth district court.
Our opinion on this question renders it unnecessary to answer your third inquiry.

Part II  Effective Date
You indicate that the effective date of CS for SB 268 is in doubt inasmuch as the bill specifies an effective date of July 1 but did not, as we earlier indicated, "become law" until July 6. The constitution provides:
Each law shall take effect on the sixtieth day after adjournment sine die of the session of the legislature in which enacted or as otherwise provided therein.[13]
The possible effective dates created by the events surrounding this bill are July 1 (the "provided" effective date), July 6 (the date on which the bill "became law") and August 5 (the sixtieth day after the session adjourned).
The attorney general has twice opined, once under a similar provision of the 1885 Constitution, and once under the 1968 Constitution, that the appropriate date in these circumstances (and in the absence of an expressed declaration of retroactivity) is the sixtieth day after adjournment.[14] He there reasoned that the effective date provided in the bill is inoperative unless the bill becomes law on or before that date. We see no reason to disagree with the analysis contained in his opinions since it is supported by valid policy reasons related to the administration of the judicial system. Accordingly, we advise you that CS for SB 268 will become effective on August 5, 1979.
Respectfully,
James C. Adkins
Joseph A. Boyd, Jr.
Ben F. Overton
James E. Alderman
BOYD, Justice, concurring.
I concur with the majority opinion that CS for SB 268, creating the new fifth district court of appeal, is constitutional.
Article IV, section 1(c) of the Florida Constitution authorizes the Supreme Court to render advisory opinions to the Governor on constitutional questions which relate to the performance of his executive duties. The constitution leaves to the justices of this Court the discretion to determine whether to respond to such gubernatorial inquiries. I believe that the question of the validity of this legislation is of extreme importance and urgency, so that we have not only the power but the duty to respond to your question.
*968 It has been argued that we should decline to pass on the validity of the legislation on the ground that under the present circumstances the constitutional question is not adequately presented. It is contended that we should wait until the issues are presented in a concrete manner in the context of an adversary proceeding between litigants. However, to allow this legislation to be implemented with its constitutionality in doubt may lead to chaotic results in our court system.
The very existence of any government in a free society depends upon its ability and willingness to respond to the needs of the people. It is therefore my view that whenever the Governor of Florida seeks advisory opinions from this Court relating to his constitutional duties we should respond fully.
Respectfully,
/s/ Joseph A. Boyd, Jr.
OVERTON, Justice, concurring.
I fully concur with the advisory opinion given by the majority to the Governor. Under the circumstances, I believe it appropriate to comment further on the effect of the adoption of only "part" of this Court's certification plan by the legislature.
In my opinion, a review of the history of the evolvement of article V, section 9, of the Florida Constitution, clearly indicates the legislature has the authority to reject that part of our certification which moved the Tenth Judicial Circuit from the present Second District Court of Appeal into the newly created Fifth District Court of Appeal. To construe the action as suggested by the opponents would necessarily require us to read out of the constitutional provision the phrase "approve ... in part." While I acknowledge the authority of the legislature to act in this manner, I do not agree with the results achieved by such action.
The creation of the new Fifth District Court of Appeal in accordance with the legislature's plan will provide no effective relief for the present area served by the Second District Court of Appeal. As a result, the second district will encompass almost three-quarters of a million more people than any other district court and will soon have the largest case load of any of the five district courts. Underlying and further aggravating the problem is the fact that this area is projected to grow from a present population of 2,451,000 to a population of 3,780,000 by the year 2000;[1] the Tampa Bay area, which this district serves, is the fourth fastest growing area in the United States.
With the implementation of this legislation, the problem of the second district remains and must be addressed unless the legislature intends the second district court to serve upwards of a million more people than any of the other districts. With the same number of judges and the same amount of taxpayers' funds, a more balanced and effective apportionment of the districts could have been achieved through the adoption of this Court's certification plan.
I recognize that the action of the legislature in approving our certification in part will relieve the appellate case load and congestion problems in the central and east coast areas of the state, more particularly the area now served by the Fourth District Court of Appeal. To that extent it is beneficial to the appellate structure of this state.
I totally disagree with the view that we should decline to answer this request from the Governor for an advisory opinion and allow the issues to proceed to this Court in *969 normal court procedural channels. The issues raised by the request are proper in that they are not general, not broad in scope, and require timely determination. The questions that this Court must answer are straightforward: whether the Governor may fill the vacancies for a newly created Fifth District Court of Appeal when the legislature has rejected that part of the Court's certification which included the tenth circuit as part of the Fifth District Court of Appeal; whether, if the law is defective, it is severable; and, under the circumstances of the Governor's not signing the legislation, a determination of the effective date.
The constitution empowers the Governor to request an opinion of the justices of the Supreme Court "as to the interpretation of any portion of this constitution upon any question affecting his executive powers and duties." Art. IV, § 1(c), Fla. Const. I agree that this Court should ensure that the advisory opinion process is not abused, but in so doing we should not eliminate its usefulness when the questions are truly justiciable, concern legal issues which require no evidentiary hearing, and are directly related to the executive powers and duties of the Governor. Our failure to answer this question could well result not only in uncertainty and confusion in the appellate structure of this state but also in unjustified delay and expense for numerous individual litigants involved in the procedural resolution of such a government-made morass. The advisory opinion authority in our constitution was designed as one method to address this type of problem.
The refusal of the dissenters to answer these questions reflects the former view of this Court, existing before the 1968 constitutional change which directed this Court to permit interested persons to be heard in advisory proceedings. This Court recognized that change in In re Advisory Opinion to the Governor, 239 So.2d 1 (Fla. 1970), in which it determined the constitutional validity of certain portions of the 1970 General Appropriations Act. That advisory opinion was rendered on a six-to-one vote. Since that opinion, this Court has rendered other advisory opinions concerning the validity of statutory provisions as they relate to possible conflicting constitutional provisions. These include determinations of the constitutional validity of certain statutory charter provisions, relative to the Governor's appointment authority, where a vacancy existed in the county tax collector's seat in In re Advisory Opinion to the Governor, 313 So.2d 717 (Fla. 1975); and the constitutional validity of the Correctional Reform Act of 1974 in In re Advisory Opinion of the Governor Civil Rights, 306 So.2d 520 (Fla. 1975). Consistent with these types of determinations, it is clearly proper for the Court to render an advisory opinion on the questions submitted by the Governor.
There is the further implication that this is an improper question because the Governor has failed to become an advocate on either side of this issue. I do not believe that the Governor must choose sides before using his constitutionally granted powers to ask this Court for an advisory opinion.
In conclusion, although I disagree with the action of the legislature, they possessed the authority to adopt the subject legislation. It is now our responsibility in the judicial branch to make it work as effectively and efficiently as possible.
 Respectfully
 /s/ Ben F. Overton
The Honorable Bob Graham
Governor of the State of Florida
The Capitol
Tallahassee, Florida 32304
Dear Governor Graham:
As we understand the questions you have presented to us concerning your constitutional powers of appointment, they can be paraphrased as follows:
1. Is CS for SB 268, as enacted by the 1979 legislature, constitutional on its face?
2. If it is, what is its effective date?
3. If it is not, is a portion of the statute severable, and therefore valid?
From the way your letter is framed, it is apparent that your concern is the validity of this legislation and that the second and third dependent questions have been added *970 merely to resolve ambiguities in statutory construction.
In 1959, Governor Collins asked the Justices of this Court virtually the same question you have now presented. In re Advisory Opinion to the Governor, 113 So.2d 703 (Fla. 1959). Governor Collins had expressed doubt as to whether he could fill a judicial vacancy in light of the questionable validity of a statute passed during the 1959 legislative session. In responding to his request, a majority of the Justices noted:
[W]e can not give you an answer of benefit without directly passing on the constitutionality vel non of [the statute].
They then wrote that Justices of this Court are without authority to render an advisory opinion as to the constitutional validity of a statute, and they declined to do so. Their exercise of judicial restraint in this regard is supported by sound governmental principles, as Justice Sundberg notes so well in his separate advice to you today, and it is widely accepted by other Justices who have been granted similar authority to issue advisory opinions at the request of another branch of government. See Answer of the Justices in the Senate, 299 Mass. 617, 13 N.E.2d 787 (1938); In re Request for an Advisory Opinion, 402 Mich. 83, 260 N.W.2d 436 (1977); Stevens, Advisory Opinions  Present Status and Evaluation, 34 Wash.L. Rev. 1, 11 (1959).
We subscribe to the well-considered views of those Justices who declined to answer Governor Collins's request and to the individual views of Justice E. Harris Drew, as expressed in his separate opinion there and in In re Advisory Opinion to the Governor, 239 So.2d 1, 12 (Fla. 1970). It is appropriate to note here, as did a majority of the Justices in 1970, that, unlike the predecessor provision of the 1885 Constitution, the 1968 Constitution and our rules now permit interested parties to be heard in these matters. Despite that fact, we share Justice Drew's opinion that this privilege, which is discretionary with the Court, did not enlarge our power with respect to the basic constitutional question of whether the validity of state statutes may properly be considered in these proceedings.
Neither the constitutional grant of authority to advise the governor nor our rules of implementation impart a truly adversary character to these advisory opinion proceedings, yet in our opinion courts can competently and carefully assert their awesome power to declare legislative acts invalid only in the context of proceedings in which both sides of a clearly-framed issue have been fully and fairly presented. The point is illustrated in this controversy. Your letter to the Court did not suggest any basis for questioning the validity of the subject statute, thus leaving the Justices and any persons interested in this subject to speculate as to the source or sources of your doubt. To compound the problem, when we opened the issue to public response, you did not elect to brief or argue to the Court your position on the issues.
Judges obviously cannot give required deference to a solemn act of the legislature when confronted with unspecified challenges which leave affected persons, including the Court, floundering in search of applicable legal doctrines. See In re Opinion of the Justices, 111 N.H. 131, 135, 276 A.2d 817, 820 (1971); Opinion of the Justices, 347 Mass. 797, 798, 197 N.E.2d 691, 693 (1964); In re Opinions of the Justices, 69 Fla. 632, 641, 68 So. 851, 853 (1915) (concurring response of Shackleford and Cockrell, JJ.).
For these reasons, we respectfully decline your request.
 Sincerely,
 /s/ Arthur J. England, Jr.
 Chief Justice
 /s/ Joseph W. Hatchett
 Justice
The Honorable Bob Graham
Governor of the State of Florida
The Capitol
Tallahassee, Florida 32304
Dear Governor Graham:
Pursuant to my obligation imposed by article IV, section 1(c) of the Florida Constitution, as implemented by rule 9.500 of the Florida Rules of Appellate Procedure, I respond to the request for an advisory opinion *971 contained in your communication of June 29, 1979. Your request inquires essentially whether CS for SB 268, enacted by the 1979 legislature in extended regular session:
1. Is constitutional vel non;
2. If so, its effective date;
3. If not constitutional, whether portions of the enactment are severable.
For the reasons which follow, I must respectfully decline to offer an opinion concerning the constitutionality of the legislature, in whole or in part, but I do deem it appropriate to advise you regarding its effective date.
Because every enactment of the legislature is deemed constitutional until adjudicated otherwise by a court of competent jurisdiction,[1a] and because I believe a determination of the effective date bears directly upon your appointive duties under article V, section 11, Florida Constitution, as that section interrelates with article X, section 3, in my judgment your query as to the effective date properly falls within the purview of article IV, section 1(c), Florida Constitution. I conclude this despite the form of your request, which could be construed to make this question dependent on the response to the other questions posed.
With respect to the merits of the inquiry concerning the effective date of CS for SB 268, it is my opinion that the legislation which became law without your signature on July 6, 1979, shall become effective on August 5, 1979. I reach this conclusion for the same reasons and based upon the same authorities recited by a majority of my colleagues in their opinion rendered simultaneously with this response.
Turning now to the reasons why I deem it inappropriate to render advice upon the constitutionality vel non of CS for SB 268. My reluctance to render such advice does not stem from a formalistic or technical posture, but from a real concern for the appropriate role to be exercised by the coordinate branches of government. The role of the judiciary in our form of government is unique in its accepted authority to declare acts of the coordinate branches invalid because they offend the terms or principles of our constitution. See Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60 (1803). This authority and responsibility to be the final arbiter of the constitutional validity of the acts of the legislative and executive branches is nothing less than awesome. While this Court should not, and does not, flinch from its obligation to exercise this power in an appropriate case,[2] nevertheless, it is a power which should be exercised with circumspection.
A proper regard for the separation of powers among the branches of government indicates that the solemn responsibility of passing on the constitutional validity of legislative and executive acts should be exercised within the traditional adversary context, a mode which has proven to be superior for framing the issues and testing the truth of competing claims. This principle is aptly put by Mr. Justice Reed in United Public Workers v. Mitchell, 330 U.S. 75, 90, 67 S.Ct. 556, 565, 91 L.Ed. 754 (1946):
Judicial adherence to the doctrine of the separation of powers preserves the courts for the decision of issues, between litigants, capable of effective determination... . When the courts act continually within these constitutionally imposed boundaries of their power, their ability to perform their function as a balance for the people's protection against abuse of power by other branches of government remains unimpaired. Should the courts seek to expand their power so as to bring under their jurisdiction ill-defined controversies over constitutional issues, they would become the organ of political theories. Such abuse of judicial power would properly meet rebuke and restriction from other branches. By these mutual checks and balances by and between the *972 branches of government, democracy undertakes to preserve the liberties of the people from excessive concentrations of authority... .
It is these very considerations which led former members of this Court to adjure passing upon the constitutional validity of a statute through an advisory opinion to the governor. See In re Advisory Opinion to the Governor, 239 So.2d 1, 12 (Fla. 1970) (Drew, J., separate advisory opinion); In re Advisory Opinion to the Governor, 113 So.2d 703 (Fla. 1959). I concur with the observation of Justice Drew in 1970 that the modification in procedure effected by the 1968 constitution and our Court rules, which permit interested parties to be heard, did not serve to enhance the Court's jurisdiction in rendering advisory opinions. Moreover, the considerations which underlay the Justices' decision in 1959 are as compelling today as then.
Furthermore, questions one and three are framed in such general and nonspecific terms that they are not susceptible of orderly consideration and response. There is no suggestion in your request of any particular constitutional defect in CS for SB 268. Accordingly, the Justices are put to the task of surveying the enactment for all manner of constitutional flaw. Briefing by interested parties has suggested some, but by no means all, avenues of constitutional attack. The judicial process is a precise issue-oriented process. Concepts such as standing, ripeness and mootness have evolved to promote orderly and focused consideration of issues. Justices in other jurisdictions have consistently eschewed the open-ended scope of inquiry which is invited by the form of your inquiry. Answer of the Justices to the House of Representatives, 377 N.E.2d 915 (Mass. 1978); Opinion of the Justices, 294 Ala. 604, 320 So.2d 622 (1975); Request for Advisory Opinion on Constitutionality of 1975 P.A. 227, 395 Mich. 148, 235 N.W.2d 321 (1975); Opinion of the Justices, 330 A.2d 769 (Del. 1974); Opinion to the House of Representatives, 99 R.I. 377, 208 A.2d 126 (1965).
I am not unmindful of the possible serious consequences of leaving unresolved an important question concerning the judicial structure of this state. I am more mindful, however, of the serious erosion to our system of separation of powers which I perceive will result from indiscriminately passing upon the constitutional validity of executive and legislative acts through the vehicle of an advisory opinion. Exigent circumstances always evoke the temptation to act, but it is in just such circumstances that we should be most careful to observe the principles of our constitution.
I know that your request was made in good faith to foster the orderly administration of justice in this state. It is in equally good faith that I feel compelled to decline your request for an opinion on questions one and three.
 Respectfully,
 /s/ Alan C. Sundberg
 Justice
NOTES
[1] Art. V, § 11, Fla. Const.
[2] Art. V, § 20(c)(5)b., Fla. Const.
[3] Fla.R.App.P. 9.500(b)(2). [Briefs were filed on behalf of the Volusia County, Putnam County, and St. Johns County Bar Associations; the attorney general, speaker of the house of representatives, and president of the senate; and Thomas A. Clark and Peter J. Winders, private Tampa attorneys.]
[4] Each district court of appeal is constitutionally required to "consist of at least three judges." Art. V, § 4(a), Fla. Const.
[5] 1979 Senate Jour. 1037 (1979 Session); 1979 H.R.Jour. 1312 (1979 Session).
[6] Other portions of this provision have no bearing on the issues you have posed for our conversation.
[7] Drafts of the provisions of article V, as revised in 1972, are maintained in the Supreme Court Library.
[8] Proposed section nine read:

Appellate court districts and judicial circuits may be increased, decreased or redefined and the number of judges of any court except the supreme court may be increased or reduced by law consistent with this article. The reduction of the number of judges shall be effective only at the expiration of a term of office.
1972 H.R.Jour. 33 (1971 Special Session).
[9] As passed by the Senate, section nine provided that changes in the alignment and number of districts and circuits and the number of judges were to be implemented:

by general law consistent with this article, but only after the supreme court certifies to the legislature its finding that there exists a need for such action based on workload and other pertinent factors.
1972 Senate Jour. 33, 39 (1971 Special Session).
[10] Art. VII, § 1(d), Fla. Const.
[11] 1979 Senate Jour. 804 (1979 Session).
[12] 1979 H.R.Jour. 1101 (1979 Session).
[13] Art. III, § 9, Fla. Const.
[14] Opin.Fla.Atty.Gen. 067-50 (August 10, 1967); Opin.Fla.Atty.Gen. 071-262 (August 30, 1971).
[1] The present population for the five districts, as established by the legislature, and as projected:

 1978 2000
First District 1,774,300 2,581,000
Second District 2,451,000 3,780,000
Third District 1,530,600 2,138,600
Fourth District 1,665,500 2,768,800
Fifth District 1,485,900 2,302,000

[1a] City of Winter Haven v. A.M. Klemm & Son, 132 Fla. 334, 181 So. 153 (1938); Bonvento v. Board of Public Instruction of Palm Beach County, 194 So.2d 605 (Fla. 1967); Knight & Wall Co. v. Bryant, 178 So.2d 5 (Fla. 1965).
[2] D'Alemberte v. Anderson, 349 So.2d 164 (Fla. 1977).