660 So.2d 734 (1995)
SERVICE INSURANCE COMPANY, et al., Appellants,
v.
The Honorable Lawton CHILES, et al., Appellees.
No. 94-3111.
District Court of Appeal of Florida, First District.
August 1, 1995.
Opinion Certifying Question September 22, 1995.
*735 Daniel C. Brown and Donna E. Blanton of Katz, Kutter, Haigler, Alderman, Marks & Bryant, P.A., Tallahassee, for appellants.
John K. Aurell, John Beranek, Kenneth P. Hart and Stephen C. Emmanuel of Macfarlane, Ausley, Ferguson & McMullen, Tallahassee; Gerald B. Curington, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee; Alan J. Leifer, Div. of Legal Services, Dept. of Ins., Tallahassee, for appellees.
WOLF, Judge.
Appellants challenge a final summary judgment upholding the validity of chapter 93-409, Laws of Florida (The Act). Appellants argue that The Act violates article III, section 19 of the Florida Constitution which governs the creation of trust funds by the state of Florida. We find that there was no violation of the constitutional provision, and affirm.
Appellants are insurance companies who sued in a multi-count complaint, challenging the constitutionality of the Hurricane Catastrophe Trust Fund created by chapter 93-409, Laws of Florida (codified at section 215.555, Florida Statutes (Supp. 1994)). The appellees are Lawton Chiles, Gerald Lewis, and Tom Gallagher in their official capacities as the State Board of Administration (SBA).
The Legislature enacted chapter 93-409 in November of 1993, during a special session which was called due to a potential crisis in the insurance industry in the aftermath of Hurricane Andrew. This Act created the Florida Hurricane Catastrophe Fund which is funded by assessments on appellants and other insurers and is administered by the SBA. The Act also contains provisions which in pertinent part read,

*736 (3) FLORIDA HURRICANE CATASTROPHE FUND CREATED.  There is created the Florida Hurricane Catastrophe Fund to be administered by the State Board of Administration. Moneys in the fund may not be expended, loaned, or appropriated except to pay obligations of the fund arising out of reimbursement contracts entered into under subsection (4), payment of debts including obligations arising out of revenue bonds issued under subsection (6), costs of the mitigation program under subsection (7), costs of procuring reinsurance, and costs of administration of the fund... .
* * * * * *
(5) REIMBURSEMENT PREMIUMS. 
(d) All premiums paid to the fund under reimbursement contracts shall be treated as premium for approved reinsurance for all accounting and regulatory purposes.
* * * * * *
(6) REVENUE BONDS. 
(a) Upon the occurrence of a hurricane and a determination that the moneys in the fund are or will be insufficient to pay reimbursement at the levels promised in the reimbursements contracts, the board shall enter into agreements with local governments for the issuance of revenue bonds for the benefit of the fund. The term of the bonds may not exceed 15 years. The board shall pledge all future revenues under subsection (5) and under paragraph (c), or a lesser portion of such revenues sufficient to raise moneys in an amount that will pay reimbursement at the levels promised in the reimbursement contracts, to the retirement of such bonds. The board may also enter into such agreements in the absence of a hurricane upon a determination that such action would maximize the ability of the fund to meet future obligations.
(b) The governing body of any county or municipality may issue bonds as defined in s. 125.013 or s. 166.101 from time to time to fund an assistance program, in conjunction with the Florida Hurricane Catastrophe Fund, for the purpose of meeting the reimbursement obligations of the fund. The issuance of such bonds is for the public purpose of ensuring that policyholders located within the county or municipality are able to recover under property insurance policies after a covered event. Revenue bonds may not be issued until validated pursuant to the provisions of chapter 75. The county or municipality shall enter into such contracts with the fund as are necessary to carry out this section. Any bonds issued under this section shall be payable from and secured by moneys received by the fund under subsection (5), and assigned and pledged to or on behalf of the county or municipality for the benefit of the holders of such bonds. The funds, credit, property, and taxing power of the state or of the county or municipality shall not be pledged for the payment of such bonds.
(c) If the board determines that the amount of revenue produced under subsection (5) is insufficient to fund revenue bonds to pay reimbursement at the levels promised in the reimbursement contracts, the board shall direct the Department of Insurance to levy an emergency assessment on each insurer writing property and casualty business in this state. Pursuant to the emergency assessment, each such insurer shall pay to the fund by July 1 of each year an amount equal to 2 percent of its gross direct written premium for the prior year from all property and casualty business in this state except for workers' compensation. The annual assessments under this paragraph shall continue until the revenue bonds issued with respect to which the assessment was imposed are retired. An insurer shall not at any time be subject to more than one assessment under this paragraph. Within 90 days after the assessment is levied under this paragraph, each insurer subject to the assessment shall make a rate filing for all coverages on which the assessment is based. If the filing reflects a rate change attributable entirely to the assessment, the filing shall consist of a certification so stating and shall be deemed approved when made, subject to the authority of the Department of Insurance to require actuarial *737 justification as to the adequacy of any rate at any time.
(7) ADDITIONAL POWERS AND DUTIES. 
(a) The board may procure reinsurance from reinsurers approved under s. 624.610 for the purpose of maximizing the capacity of the fund.
(b) In addition to borrowing under subsection (6), the board may also borrow from any market sources at prevailing interest rates.
* * * * * *
(10) VIOLATIONS.  Any violation of this section constitutes a violation of the Insurance Code.
The appellants filed a motion for summary judgment, and the appellees filed a cross-motion for summary judgment. Appellants argued that chapter 93-409 violated article III, section 19(f) of the Florida Constitution which states,
(f)(1) No trust fund of the State of Florida or other public body may be created by law without a three-fifths (%) vote of the membership of each house of the legislature in a separate bill for that purpose only.
The trial count found that the legislation was constitutional and granted SBA's cross-motion for summary judgment in pertinent part stating,
B. Chapter 93-409, Laws of Florida, is a law establishing a trust fund. Therefore, it must meet the separate bill requirement of Article III, Section 19(f)(1) of the Florida Constitution. Because it is a substantive law, Chapter 94-409 must also meet the one subject and matter properly connected therewith standard of Article III, Section 6 of the Florida Constitution.
C. Chapter 93-409 is not an appropriation bill. Therefore, Article III, Section 12 of the Florida Constitution does not apply.
D. Chapter 93-4090 is not a citizens' initiative amendment to the Florida Constitution. Therefore, Article XI, Section 3 of the Florida Constitution does not apply.
E. Chapter 93-409 complies with the requirements of Article III, Section 19(f) and Article III, Section 6 of the Florida Constitution.[1]
Article III, section 19(f)(1) of the constitution dealing with the creation of trust funds became effective on November 4, 1992. The Legislature enacted section 215.3207 relating to creation of trust funds in 1992, and has subsequently amended the statute in 1993 and 1994. This section implements the constitutional provision and reads,
Trust funds; establishment; criteria.  A trust fund may be created by law only by the Legislature and only if passed by a three-fifths vote of the membership of each house in a separate bill for that purpose only. Except for trust funds being recreated by the Legislature, each trust fund must be created by statutory language that specifies at least the following:
(1) The name of the trust fund.
(2) The agency or branch of state government responsible for administering the trust fund.
(3) The requirements or purposes that the trust fund is established to meet.
(4) The sources of moneys to be credited to the trust fund or specific sources of receipts to be deposited in the trust fund.
A relatively contemporaneous construction of the constitution by the Legislature is strongly presumed to be correct. Brown v. Firestone, 382 So.2d 654 (Fla. 1980); Smith v. Brantley, 400 So.2d 443 (Fla. 1981). *738 In enacting section 215.3207, the Legislature reasonably interpreted the constitutional provision to mean that items related to the purpose, administration, and funding should be included within a bill creating a trust fund. Matters relating to regulation and solvency of the fund clearly fall within the parameters of administration and funding.
The appellants argue that the bill creating the trust fund may only create the fund rather than also dealing with matters reasonably relating to the creation. This overly restrictive interpretation is unreasonable and flies in the face of the obvious intent of article III, section 19 of the constitution. The intent of this provision is to make it more difficult to create trust funds (three-fifths vote requirement), and to make such funds more accountable by subjecting them to the detailed planning and appropriation process created in subsections (a) through (h) of article III, section 19. A prohibition against including the details of purpose, administration, and funding of a trust fund from the bill creating the fund (required to be adopted by a three-fifths vote) would circumvent constitutional intent. That intent is to have heightened scrutiny prior to creating trust funds. If a skeletal bill was all that was allowed or required to create a trust fund, the details concerning purpose, administration, and funding would have to be adopted in a separate bill not subject to the three-fifths voting requirement. This clearly was not the intent of the constitutional provision.
All of the provisions of chapter 93-409 are related to the purpose, administration (including regulation), and funding (including ensuring solvency) of the trust fund.
The purpose of the Florida Hurricane Catastrophe Fund was set forth in section 1 of The Act:
(1) Findings and purpose.  The Legislature finds and declares as follows:
(a) There is a compelling state interest in maintaining a viable and orderly private sector market for property insurance in this state. To the extent that the private sector is unable to maintain a viable and orderly market for property insurance in this state, state actions to maintain such a viable and orderly market are valid and necessary exercises of the police power.
(b) As a result of unprecedented levels of catastrophic insured losses in recent years, and especially as a result of Hurricane Andrew, numerous insurers have determined that in order to protect their solvency, it is necessary for them to reduce their exposure to hurricane losses. Also as a result of these events, world reinsurance capacity has significantly contracted, increasing the pressure on insurers to reduce their catastrophic exposures.
(c) Mortgages require reliable property insurance, and the unavailability of reliable property insurance would therefore make most real estate transactions impossible. In addition, the public health, safety, and welfare demand that structures damaged or destroyed in a catastrophe be repaired or reconstructed as soon as possible. Therefore, the inability of the private sector insurance and reinsurance markets to maintain sufficient capacity to enable residents of this state to obtain property insurance coverage in the private sector endangers the economy of the state and endangers the public health, safety, and welfare. Accordingly, state action to correct for this inability of the private sector constitutes a valid and necessary public and governmental purpose.
(d) The insolvencies and financial impairments resulting from Hurricane Andrew demonstrate that many property insurers are unable to unwilling to maintain reserves, surplus, and reinsurance sufficient to enable the insurers to pay all claims in full in the event of a catastrophe. State action is therefore necessary to protect the public from an insurer's unwillingness or inability to maintain sufficient reserves, surplus, and reinsurance.
(e) A state program to provide reimbursement to insurers for a portion of their catastrophic hurricane losses will create additional insurance capacity sufficient to ameliorate the current dangers to the state's economy and to the public health, safety, and welfare.

*739 (f) It is essential to the functioning of a state program to increase insurance capacity that revenues received be exempt from federal taxation. It is therefore the intent of the Legislature that this program be structured as a state trust fund under the direction and control of the State Board of Administration and operate exclusively for the purpose of protecting and advancing the state's interest in maintaining insurance capacity in this state.
The first provision challenged by appellants is that part of chapter 93-409 which created section 215.555(5)(d), which clarifies the status of payments by insurance companies and specifies that the moneys paid to the fund will be treated as moneys paid for approved reinsurance for accounting and regulatory purposes. Because the purpose of the CAT Fund is to provide the functional equivalent of reinsurance for insurance companies in the event of a catastrophic event, this provision directly relates to the purpose of The Act. This accounting mechanism directly affects the burden placed on the insurance companies required to make payments into the trust fund. The issue of the burden which will be placed on payors into a trust fund should and does have an affect on the legislative determination of the viability of creating a trust fund. Second, the companies attack the portion of The Act which creates section 215.555(6)(a) and (b), Florida Statutes. These subsections authorize local governments to issue revenue bonds "for the benefit of the fund" if the SBA finds it necessary because the moneys in the fund are insufficient to meet the fund's contractual obligations. Because the proceeds of these bonds provide a revenue source directly for the credit and benefit of the trust fund, which revenues will be deposited in the fund, they directly relate to funding and solvency of the trust fund.
The third challenged provision creates section 215.555(6)(c), Florida Statutes, which provides that if the SBA determines the amount of revenue produced under section 215.555(5) is insufficient to fund bonds to pay reimbursement to the insurance companies at the promised levels, then the SBA will authorize the Department of Insurance to levy an emergency assessment on each insurer writing property and casualty insurance business in the state. The proceeds of these assessments are to be deposited in the trust fund in order to enable the fund to meet debt service obligations with respect to bonds issued for the benefit of the fund. This provision also directly relates to the funding and solvency of the trust fund in emergency situations. Providing for how to deal with an emergency in the context of this emergency fund can hardly be considered extraneous to creation of the trust fund.
Last, the plaintiffs challenge section 4 which amends section 624.5091(3), Florida Statutes, to provide that reimbursement premiums and emergency assessments paid to the CAT Fund shall be excluded from the calculation of the retaliatory tax authorized by section 624.5091, Florida Statutes. This provision clarifies how, for tax purposes, to appropriately account for premiums paid to the fund. Resolving the question of whether fund premiums are subject to this tax is a policy decision of the Legislature. This section could have just as appropriately been included in the CAT Fund section itself, rather than as an amendment to section 624.5091.
In summary, all of the provisions challenged by appellants directly relate to the purpose, funding, administration, and regulation of the Hurricane Catastrophe Trust Fund. The Act is, therefore, not violative of article III, section 19 of the Florida Constitution. The decision of the circuit court is affirmed.
LAWRENCE, J., concurs.
WEBSTER, J., dissenting with written opinion.
WEBSTER, Judge, dissenting.
I acknowledge our responsibility to apply to statutes a presumption of constitutionality, and to construe them in such a way as to uphold them, to the extent that is reasonably possible. E.g., Florida Dep't of Educ. v. Glasser, 622 So.2d 944 (Fla. 1993); Capital City Country Club v. Tucker, 613 So.2d 448 (Fla. 1993). I recognize, also, the importance of the legislation challenged by this appeal. However, notwithstanding those considerations, *740 I am constrained to conclude that there is no reasoned way to reconcile chapter 93-409, Laws of Florida, with article III, section 19(f)(1), of the Florida Constitution. Accordingly, I dissent.
Like statutory construction, the process of constitutional interpretation is far from scientific. There is a plethora of rules intended to assist in determining the meaning of ambiguous provisions. Because many of those rules are contradictory, in a very real sense, the outcome often will be determined by the rules one chooses to use. However, a first principle, common to both statutory and constitutional interpretation, is the precept that, if the language is clear and unambiguous, there is nothing to interpret, and no reason to resort to rules of construction. Thus, in City of Jacksonville v. Continental Can Co., 113 Fla. 168, 172-73, 151 So. 488, 489-90 (1933), the court said that, when faced with the need to ascertain the meaning of a part of our constitution,
the aim should be to give effect to the purpose indicated by a fair interpretation of the language, the natural signification of the words used in the order, and grammatical arrangement in which they have been placed. If the words thus regarded convey a definite meaning and involve no absurdity or contradiction between the parts of the same instrument, no construction is allowable.
The words and terms of a Constitution are to be interpreted in their most usual and obvious meaning, unless the text suggests that they have been used in a technical sense. The presumption is in favor of the natural and popular meaning in which the words are usually understood by the people who have adopted them.
....
It has been said that, as statutes are hastily and unskillfully drawn, they need construction to make them sensible, but Constitutions import the utmost discrimination in the use of language, that which the words declare is the meaning of the instrument. It must be very plain, nay absolutely certain, that the people did not intend what the language they had employed in its natural signification imports before a court should feel at liberty to depart from the plain meaning of a constitutional provision.
More recently, the supreme court has said that "[a]ny inquiry into the proper interpretation of a constitutional provision must begin with an examination of that provision's explicit language. If that language is clear, unambiguous, and addresses the matter in issue, then it must be enforced as written." Florida Soc'y of Ophthalmology v. Florida Optometric Ass'n, 489 So.2d 1118, 1119 (Fla. 1986). Accord Florida League of Cities v. Smith, 607 So.2d 397, 400 (Fla. 1992) ("the law is settled that when constitutional language is precise, its exact letter must be enforced and extrinsic guides to construction are not allowed to defeat the plain language"); In re Advisory Opinion to the Governor, 374 So.2d 959, 964 (Fla. 1979) ("[i]n construing provisions of the constitution, each provision must be given effect, according to its plain and ordinary meaning"); City of St. Petersburg v. Briley, Wild & Associates, Inc., 239 So.2d 817, 822 (Fla. 1970) ("[i]f the language is clear and not entirely unreasonable or illogical in its operation we have no power to go outside the bounds of the constitutional provision in search of excuses to give a different meaning to words used therein").
Personally, I find nothing unclear, imprecise or ambiguous in the following language:
(f) TRUST FUNDS.
(1) No trust fund of the State of Florida or other public body may be created by law without a three-fifths (3/5) vote of the membership of each house of the legislature in a separate bill for that purpose only.
Art. III, § 19(f)(1), Fla. Const. I fail to see how the phrase "in a separate bill for that purpose only" can possibly be read as intended to refer to anything other than the creation of trust funds. It seems to me that the only aspect of the provision as to which there is room for discussion relates to what matters must necessarily be included in a bill in order to create a trust fund. This would appear to be a matter regarding which the collective judgment of the legislature should carry considerable weight. See, e.g., State v. *741 Kaufman, 430 So.2d 904, 907 (Fla. 1983) ("[a] contemporaneous construction of a constitutional provision by the legislature is presumptively correct unless manifestly erroneous"). In fact, the legislature has spoken on this matter in section 3 of chapter 93-159, Laws of Florida (amending section 215.3207, Florida Statutes, which had been created by chapter 92-142, section 17, Laws of Florida):
Trust funds; establishment; criteria.  All trust funds shall be established by the Legislature by a three-fifths vote of the membership of each house in a separate bill for that purpose only and shall be created by statutory language that specifies at least the following:
(1) The name of the trust fund.
(2) The agency or branch of government responsible for administering the trust fund.
(3) The requirements or purposes which the trust fund is established to meet.
(4) The sources of moneys which shall be credited to the trust fund or specific sources of receipts to be deposited into the trust fund.
(5) A requirement that the trust fund shall be abolished not more than 4 years after the effective date of the act authorizing its creation, if such abolition is required by s. 19(f)(2), Art. III of the State Constitution.
Subsection (5) is, of course, mandated by article III, section 19(f)(2), of the Constitution. The other four subsections all address matters logically indispensable to the creation of a trust fund  it must have a name; the agency or branch of government which will administer it must be identified; the reason or reasons for its creation must be specified; and the source or sources of the funds to be held must be identified. In addition, as the legislature recognized, there might be other matters indispensable to the creation of some particular fund. This seems to me perfectly consistent with the clear language of section 19(f)(1).
However, I am unable to follow the process by which the majority gleans from this narrow, unobjectionable, legislative interpretation the intent that all "items related to the purpose, administration, and funding should be included within a bill creating a trust fund." Ante, at 738. Rather, it appears to me that such a conclusion cannot reasonably be drawn from the legislature's language. Moreover, I suggest that, were such a conclusion sustainable from the legislature's language, it would be "manifestly erroneous," given the language of section 19(f)(1) and, therefore, entitled to no weight.
In my opinion, the clear intent of section 19(f)(1) is that trust funds may be created only by a bill which addresses no other purpose. However, the concept of creation necessarily includes more than the mere language that "such-and-such a trust fund is hereby created." It includes, as well, all matters logically indispensable to the creation of such a fund  matters such as those identified by the legislature in what is now section 215.3207, Florida Statutes. (Obviously, this is a reading much narrower than that of the majority  that all matters "related to the purpose, administration, and funding" of the trust fund may be included in the bill creating the fund.)
I concede that many (perhaps even most) of the matters addressed in chapter 93-409 are logically indispensable to the creation of the Florida Hurricane Catastrophe Fund. However, it seems to me that some clearly are not. On the contrary, some of the provisions seem to me clearly unrelated in any meaningful sense to the creation of the Fund. In particular, I am unable to discern any connection between creation of the Fund and the following provisions:
Section 1(5)(d), which states that "[a]ll premiums paid to the [F]und under reimbursement contracts shall be treated as premium for approved reinsurance for all accounting and regulatory purposes" (codified as section 215.555(5)(d), Florida Statutes);
Section 1(6)(b), which authorizes counties and municipalities to "issue bonds as defined in s. 125.013 or s. 166.101 from time to time to fund an assistance program, in conjunction with the ... Fund, for the purpose of meeting the reimbursement obligations of the [F]und," and discusses requirements for issuance and payment *742 of such bonds (codified as section 215.555(6)(b), Florida Statutes);
Section 1(10), which states that any violation of any aspect of section 1 "constitutes a violation of the Insurance Code" (codified as section 215.555(10), Florida Statutes);
Section 3, which directs the State Board of Administration to "request an expedited opinion from the United States Internal Revenue Service as to the tax-exempt status of the state with respect to revenues collected" by the Fund, and other matters; and
Section 4, which amends section 624.5091, Florida Statutes (a part of the Florida Insurance Code), relating generally to the amount, and method of computation, of retaliatory taxes to be imposed by the Department of Revenue upon foreign insurers for the purpose of ensuring that Florida insurers are competing on an equal footing with foreign insurers.
Because I am unable to conclude, based upon a fair reading of chapter 93-409, that all of its provisions are logically indispensable to the creation of the Fund, I am constrained to conclude that chapter 93-409 violates article III, section 19(f)(1), of the Florida Constitution. Therefore, I dissent.

OPINION ON MOTION FOR CERTIFICATION
WOLF, Judge.
The majority and dissenting opinions in the instant case offer differing means of interpreting article III, section 19(f) of the Florida Constitution. This section has never been addressed by the Florida appellate courts. According to the majority opinion, in implementing this constitutional provision, the Legislature intended that all items relating "to the purpose, administration, and funding should be included within a bill creating a trust fund." The dissent, however, interprets the constitutional provision to mean that only matters "logically indispensable to the creation of a trust fund" can be included in a bill creating a trust fund. We feel that in light of the varying interpretations of this new constitutional provision, it is appropriate to certify the following question, suggested by the appellants, to be one of great public importance:
GIVEN THE REQUIREMENT OF ARTICLE III, SECTION 19(f)(1), THAT NO TRUST FUND BE CREATED EXCEPT "IN A SEPARATE BILL FOR THAT PURPOSE ONLY," MAY THE LEGISLATURE INCLUDE WITHIN A BILL CREATING A TRUST FUND ALL ITEMS THAT RELATE TO THE PURPOSE, ADMINISTRATION, AND FUNDING OF THE TRUST FUND, OR SHOULD THE BILL CREATING THE TRUST FUND BE LIMITED TO THOSE MATTERS LOGICALLY INDISPENSABLE TO THE TRUST FUND'S CREATION?
WEBSTER and LAWRENCE, JJ., concur.
NOTES
[1] Contrary to assertions made by appellants, we do not read the final judgment as being a statement by the trial court that the same legal standard applies in determining compliance with article III, section 19(f)(1), and article III, section 6 of the constitution. We read this portion of the judgment to state only that the challenged statute complies with both provisions. We also disagree with the idea that an affirmance of the trial court requires that we adopt the same legal analysis for determining compliance with art. III, § 19(f) that has previously been adopted for determining compliance with art. III, § 6 of the Florida Constitution. Pursuant to art. III, § 6, the legislation may involve any subject which the Legislature determines will be the common thread that links various parts of a bill so as to not violate the one-subject provision. On the other hand, review pursuant to art. III, § 19(f) does not involve a search for a common thread, but must focus on creation of the trust fund and subjects directly connected therewith.